IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KENNETH M. MORRIS,                    §
                                      §
         Plaintiff,                   §
                                      §
v.                                    §          CIVIL NO. H-04-0577
                                      §
TRANS UNION LLC,                      §
                                      §
         Defendant.                   §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 26), Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment (Docket Entry No. 33), and Defendant's Motion to Strike Plaintiff's Response Evidence (Docket Entry No. 48). Also pending are two motions to exclude expert testimony (Docket Entry Nos. 23, 25), a motion to compel (Docket Entry No. 30), and a motion to intervene (Docket Entry No. 39). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED**.

Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment is **DENIED**. Defendant's motion to strike Plaintiff's response evidence is **DENIED** and Plaintiff's objections to Defendant's evidence are **OVERRULED** because the court has not relied on any incompetent evidence. Pending adoption of this Memorandum

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry No. 22.

and Recommendation, all remaining motions are **DENIED AS MOOT**.

## I.  Case Background

Plaintiff filed this action under the Fair Credit Reporting Act ("FCRA") against Defendant, a consumer reporting agency, alleging that Defendant failed to comply with its obligations in relation to the reinvestigation of a disputed item on Plaintiff's personal credit report.  Plaintiff also brought a claim for libel. This case is one of several cases originally filed by Plaintiff in state court that deal with the allegedly inaccurate reporting of some of Plaintiff's credit information.[2]

The background facts in all of the cases are very similar. Plaintiff's complaint relates to a revolving credit account with Retailers National Bank–Target[3] ("RNB-Target").[4]  The origin of the account can be traced to an Instant Credit Application submitted to RNB-Target on June 18, 1997, by Plaintiff's then-wife, Rebecca B.

---

[2]      In two other cases that are pending before this court, Plaintiff sued Equifax Information Services LLC, CSC Credit Services, Inc., and Experian Information Solutions, Inc., all consumer reporting agencies, for violations of the FCRA.  See Morris v. Equifax Info. Servs. LLC, Civil Action No. H-04-423 (S.D. Tex. removed Feb. 2, 2004)(dismissed June 28, 2005); Morris v. Experian Info. Solutions, Inc., Civil Action No. H-04-552 (S.D. Tex. removed Feb. 12, 2004).  Plaintiff also filed suit against Target Corporation and Retailers National Bank in state court.  See Morris v. Target Corporation, No. 801888 (Harris County Civil Court at Law No. 4 Sept. 24, 2003).  According to various references in the record, Plaintiff apparently settled his claims against CSC Credit Services, Inc., Target Corporation, and Retailers National Bank.

[3]      Retailers National Bank, a subsidiary of Target Corporation, is now know as Target National Bank.  Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12.  In this Memorandum, the court refers to the creditor on the Morris Target account as RNB-Target.

[4]      See Notice of Removal, Docket Entry No. 1, Ex. C-1, Plaintiff's Original Petition.

Morris ("Rebecca").[5]   The application includes Plaintiff's name, address, date of birth, social security number, place of employment, and other identifying information.[6]   Even though Rebecca identified Plaintiff as the primary applicant and herself as the "Joint Applicant," she signed the application as the applicant, not the "Joint Applicant."[7]   Plaintiff did not sign the application form.[8]   Plaintiff testified that he did not authorize the opening of the account and did not communicate with RNB-Target before it established the account.[9]   Nearly four years after Target opened the credit account, Plaintiff and Rebecca divorced.[10]   At that time, Plaintiff affirmed, he did not know that the Target account existed.[11]

In August 2002, after the divorce, Rebecca charged $129.91 in merchandise to the account at a Target in Baton Rouge, Louisiana.[12] RNB-Target mailed the August statement, which reflected this

---

[5]      Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 56, Instant Credit Application.

[6]      Id.; see also Ex. 14, Plaintiff's Deposition, p. 90.

[7]      Id. at Ex. 56, Instant Credit Application.

[8]      See id.

[9]      Exhibits to Plaintiff's Response, Docket Entry No. 43, Ex. 1, Plaintiff's Declaration, ¶ 29.

[10]      See id. at ¶ 28.

[11]      Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, p. 135.

[12]      See id. at Ex. 59, RNB-Target billing statement dated Aug. 19, 2002; Exhibits to Plaintiff's Response, Docket Entry No. 43, Ex. 1, Plaintiff's Declaration, ¶ 30.

charge, to Plaintiff's home address.[13]  Plaintiff forwarded that statement to Rebecca, who lived in Louisiana.[14]  Upon receiving the September statement, Plaintiff forwarded that to Rebecca as well.[15] Rebecca made payments totaling $20 on the account.[16]  After Plaintiff received the September statement, he contacted RNB-Target by phone, gave Rebecca's address, and stated that he did not intend to pay the bill.[17]  Nevertheless, RNB-Target continued to mail bills to Plaintiff.[18]  Plaintiff threw all of the subsequent bills in the trash.[19]

In a letter dated May 23, 2003, RNB-Target notified Plaintiff that it had charged-off the remaining debt on the account in the amount of $253.10, which apparently included late fees and interest along with the remaining balance from Rebecca's August 2002 purchase.[20]  The letter also stated that RNB-Target had permanently closed the account and had reported the negative account

---

[13]    See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 59, RNB-Target billing statement dated Aug. 19, 2002.

[14]    Id. at Ex. 14, Plaintiff's Deposition, p. 125.

[15]    Id. at p. 126.

[16]    See id. at Ex. 12, Deposition of Susan Wolf, pp. 126, 317-18.

[17]    Id. at Ex. 14, Plaintiff's Deposition, p. 126.

[18]    Id. at p. 127.

[19]    Id.

[20]    See id. at Ex. 12, Deposition of Susan Wolf, p. 161; Ex. 37, letter from RNB-Target to Plaintiff dated May 23, 2003.

information to national credit bureaus.[21]

In July 2003, Plaintiff received an adverse action letter concerning an automobile insurance quote from GEICO.[22]  Immediately, Plaintiff downloaded an internet "3-in-1 Credit Report" prepared by TrueCredit.[23]  The report included information from three consumer reporting agencies, including Defendant.[24]   All three consumer reporting agencies listed Plaintiff as jointly responsible for the RNB-Target account, the balance of which had been charged off as a bad debt.[25]

Within two weeks, Plaintiff dispatched to Defendant a letter in which he addressed various allegedly inaccurate items.[26] Plaintiff notified Defendant that he was no longer married to Rebecca, corrected certain identifying information, and stated the following regarding the RNB-Target account:

> a.   **RNB-Target:**  I owe Target nothing.  This was never a "joint" account.  I have asked Target to send me any information that shows this account was ever a "joint" account that obligated me.  Target has not provided me this information and cannot do so.

---

[21]    Id. at Ex. 37, letter from RNB-Target to Plaintiff dated May 23, 2003.

[22]    Id. at Ex. 14, Plaintiff's Deposition, p. 48.

[23]    Id. at pp. 48-49; Ex. 15, TrueCredit report dated July 3, 2003.

[24]    See id. at Ex. 15, TrueCredit report dated July 3, 2003.

[25]    See id. at MOR 000015.

[26]    Id. at Ex. 14, Plaintiff's Deposition, pp. 49-50; Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003.

> The balance that Target has charged off derives from a charge effected by my Former Wife in late 2001 [sic] (after our divorce). The charge is not (and has never been) my legal responsibility. I have informed Target of this fact on numerous occasions, but Target's ears are deaf to reality.
>
> In short, Target's bureaucratic bungling is solely responsible for this false information that Target has furnished to you. It is the only "derogatory" condition that you show on my credit report.
>
> Please correct this item and show it as disputed until you correct it. I'll litigate with Target separately. Target's feckless attitude toward this issue is simply reprehensible. Target has absolutely no legitimate basis for claiming that I owe (or ever owed) this alleged debt.[27]

Plaintiff also challenged information associated with two other accounts on the credit report.[28] On that same day, Plaintiff drafted similar letters addressed to RNB, Equifax Information Services, and Experian Information Solutions.[29] Defendant received Plaintiff's letter on July 19, 2003.[30]

The relationship between Defendant and RNB-Target as to the reporting of consumer accounts was governed by a contract.[31]

---

[27]    Id. at Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003, p. 3.

[28]    See id.

[29]    See id. at Ex. 14, Plaintiff's Deposition, p. 50.

[30]    See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 1, Plaintiff's First Amended Complaint, p. 4.

[31]    See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12.

Pursuant to the agreement, RNB-Target committed to furnish "complete and accurate" information to Defendant and to comply "with all requirements of the FCRA."[32]   Furthermore, RNB-Target agreed to certify as complete and accurate the information it provided in response to Defendant's notifications of consumer disputes.[33]   According to Defendant, RNB-Target was a reliable furnisher of information for many years.[34]   No one, for at least a decade prior to Plaintiff's dispute, had reported problems with RNB-Target's reporting of account information.[35]

In accordance with its agreement with RNB-Target and its usual practice, Defendant sent an Automated Consumer Dispute Verification ("ACDV")[36] form to RNB-Target, identifying the dispute as "Consumer not liable for acct (ie, ex-spouse, business).  If liable, provide complete ID and [Equal Credit Opportunity Act ("ECOA")] Code."[37] The form also included the following information in the "consumer message" section:  "CLMS ACCT IS IN DISPUTE AND ACCT NEVER JOINT."[38]

---

[32]   Id.

[33]   Id.

[34]   Id. at ¶ 13.

[35]   Id.

[36]   Consumer Dispute Verification forms are referred to as CDV forms in this memorandum.

[37]   Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 57, RNB-Target Aug. 9, 2003, response to ACDV form dated July 30, 2003.

[38]   Id.

On the form, Defendant included Plaintiff's name, address, and other identifying information, as well as details about the account in question.[39]  Defendant sent the form to RNB-Target on July 30, 2003.[40]

In its August 8, 2003, response to the ACDV, RNB-Target updated the date on which the information was reported from June 2003 to August 2003.[41]  On August 12, 2003, Defendant sent Plaintiff the results of the investigation in the form of a consumer report.[42] The report reflected that the RNB-Target verified the account as joint and made no changes to the account information.[43]  Defendant explained that Plaintiff could request information about how the investigation was conducted and the name, address, and telephone number of persons contacted, as well as submit a consumer statement concerning the RNB-Target dispute inclusion on his report.[44]

The report prompted Plaintiff to write Defendant another letter, dated August 19, 2003.[45]  In his second letter, Plaintiff requested that the following statement be added to his report:

---

[39]    Id.

[40]    See id.

[41]    Id.

[42]    See id. at Ex. 17, Consumer Report dated August 12, 2003.

[43]    Id. at MOR 000379.

[44]    Id. at MOR 000379, MOR 000384.

[45]    Id. at Ex. 21, letter from Plaintiff to Defendant dated Aug. 19, 2003.

8

> RNB-Target has provided false and legally erroneous information about me to TransUnion. I have never opened, maintained, or assumed legal responsibility for any account at Target. I have never charged a Target purchase to a Target account in my lifetime. I have informed Target of these facts and requested information from Target concerning this alleged account that it has not provided to me and cannot provide to me (because it does not exist). I have legal demands pending against Target concerning this matter. I have never owed Target a penny (or more). Target's conduct here is shameful.[46]

Plaintiff also requested several pieces of information from Defendant, including a description of the procedure used to investigate, a description of the procedure used to determine the accuracy and completeness of the RNB-Target's response, correspondence between Defendant and RNB-Target from January 1, 2003, and the name, business address, and telephone number of those persons contacted in the process.[47]

Defendant responded to this letter by initiating another reinvestigation and by writing Plaintiff two letters.[48] In the second ACDV, Defendant identified the dispute as "Not his/hers. Provide complete ID."[49] RNB-Target verified the information as reported.[50] The two letters, both dated August 29, 2003, were

---

[46] Id. at p. 2.

[47] Id. at p. 1.

[48] See id. at Ex. 13, RNB-Target Sept. 12, 2005, response to ACDV form dated August 30, 2003; Ex. 18, letter from Defendant to Plaintiff dated Aug. 29, 2003; Ex. 20, letter from Defendant to Plaintiff dated Aug. 29, 2003.

[49] See id. at Ex. 13, RNB-Target Sept. 12, 2005, response to ACDV form dated August 30, 2003.

[50] Id.

9

mailed before Defendant received RNB-Target's response.[51]   One
letter denied Plaintiff's request for copies of all correspondence
between Defendant and RNB-Target by explaining its policy not to
provide ACDV forms to consumers.[52]   The letter also explained
Defendant's investigation procedure, stating in particular that
Defendant's practice was "to contact, by mail or telephone, the
source of the [disputed] information."[53] The other letter contained
the names and addresses of all creditors that reported information
on Plaintiff, including RNB-Target, and the names and addresses of
all creditors who had received copies of Plaintiff's credit
report.[54]

Still dissatisfied with Defendant's response, Plaintiff wrote
Defendant a third letter, dated September 5, 2003.[55]   Therein,
Plaintiff posed a number of questions challenging Defendant's
response to his second letter.[56]  For example, Plaintiff wrote:

> 3.   In connection with your alleged investigation of my
> inquiries, did you receive any "dispute
> verification responses from creditors" that you are

---

[51]    See id. at Ex. 18, letter from Defendant to Plaintiff dated Aug. 29,
2003; Ex. 20, letter from Defendant to Plaintiff dated Aug. 29, 2003.

[52]    Id. at Ex. 18, letter from Defendant to Plaintiff dated Aug. 29,
2003.

[53]    Id.

[54]    Id. at Ex. 20, letter from Defendant to Plaintiff dated Aug. 29,
2003.

[55]    Id. at Ex. 22, letter from Plaintiff to Defendant dated Sept. 5,
2003.

[56]    Id.

refusing to provide me?  If so, please provide me
the name and address of each particular creditor
who provide[d] you a "dispute verification"
response that you are refusing to provide me.  The
law does not entitle you to withhold from me any
dispute verification that you receive from any
creditor concerning your alleged investigation of
my credit file.

4.    Why have you *not* provided me "the name, address,
and telephone number of anyone whom you contacted
for information" in connection with your alleged
investigation of [my] credit file?  You have
provided me a list of creditors, but you have not
identified *any* particular creditors or named *any*
particular person at any creditor that you
contacted in connection with your alleged
investigation.  Simply put, you failed to comply
with your legal obligations under federal and Texas
law to provide me the information that I
specifically requested.[57]

Plaintiff concluded the letter by stating:  "I expect you to comply

fully with your legal obligations.   Boilerplate responses

(generalized in nature) only exacerbate the situation.  Let's get

to the bottom of this now."[58]

Upon receiving Plaintiff's third letter, Defendant sent two

more letters to Plaintiff, both dated September 16, 2003.[59]  One

explained Defendant's investigation procedures again, this time,

indicating that Defendant contacted the source of the information

by "mail or electronic means."[60]  The letter included an address for

---

[57]    <u>Id.</u> at pp. 1-2.

[58]    <u>Id.</u> at p. 2.

[59]    <u>See id.</u> at Ex. 19, letter from Defendant to Plaintiff dated Sept. 16,
2003; Ex. 23, letter from Defendant to Plaintiff dated Sept. 16, 2003.

[60]    <u>Id.</u> at Ex. 19, letter from Defendant to Plaintiff dated Sept. 16,
2003.

"RNB-Dayton/Hudson/Fields," but no phone number.[61]   The other letter informed Plaintiff that he should contact the creditor directly for any documentation or written verification concerning his account.[62] On the same date as the letters, Defendant sent Plaintiff the results of its second investigation.[63]   The report reflected that RNB-Target verified the account and included the consumer statement that Plaintiff previously submitted.[64]

The correspondence between Plaintiff and Defendant continued with Plaintiff's next letter, dated September 22, 2003.[65]  Plaintiff charged Defendant with the failure to provide the information that he requested or to answer several of the questions he posed.[66]   He also threatened legal action:

> You apparently have provided me all information you intend to provide me.  I again request that you confirm in writing that you do not intend to provide me any additional information, as I want to eliminate any doubt before I commence legal action against you.  Your redundant and additional boilerplate form letters are grossly inadequate.  You continue to refuse to honor your legal obligations.[67]

---

[61]   Id.

[62]   Id. at Ex. 23, letter from Defendant to Plaintiff dated Sept. 16, 2003.

[63]   See id. at Ex. 24, consumer report dated Sept. 16, 2003.

[64]   Id. at pp. 1, 5-6.

[65]   See id. at Ex. 60, letter from Plaintiff to Defendant dated Sept. 22, 2003.

[66]   Id. at p. 1.

[67]   Id. at p. 2.

Defendant responded on October 1, 2003, by sending Plaintiff another copy of his consumer report and three letters.[68] This time, the letters included the full list of creditors from which information had been received and to which reports had been provided, reiterated its policy on the provision of ACDV forms, avowed an inability to determine the nature of Plaintiff's request, requested more information from Plaintiff, and requested that Plaintiff contact Defendant directly by phone.[69] Then, the parties engaged in a brief stint of futile telephone tag in October 2003.[70]

The record lacks evidence of any further communication between Plaintiff and Defendant prior to the inception of this lawsuit in January 2004. Shortly after filing suit, Plaintiff began applying for credit.[71] In January, Plaintiff applied for credit cards from Bank of America, Capital One, Chase, Discover, and Citibank.[72] All

---

[68]   See id. at Ex. 26, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 28, consumer report dated Oct. 1, 2003; Ex. 29, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 30, letter from Defendant to Plaintiff dated Oct. 1, 2003.

[69]   Id. at Ex. 26, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 29, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 30, letter from Defendant to Plaintiff dated Oct. 1, 2003.

[70]   Id. at Ex. 14, Plaintiff's Deposition, pp. 181-85.

[71]   Id. at pp. 219-20.

[72]   See id. at Ex. 43, Bank of America online application pending notification; Ex. 46, Chase application receipt; Ex. 47, Citibank application receipt; Ex. 51, Discover application receipt. Plaintiff also intended to apply for a credit card from Amazon.com, but chose not to submit an application because he could not affirm that his credit was clear of "seriously delinquent accounts." See id. at Ex. 14, Plaintiff's Deposition, pp. 233-34; Ex. 42, blank online Amazon.com application.

but Bank of America denied him the credit he sought.[73]   Of the
companies rendering a negative decision, only Capital One and Chase
identified Defendant as one of the consumer reporting agencies from
which they received information.[74]   Capital One denied Plaintiff
credit "based in whole or in part on information" obtained from
Defendant and two other consumer reporting agencies.[75]   The letter
did not link the denial to the RNB-Target account.[76]   Chase denied
Plaintiff unsecured credit, but offered him a line of credit
secured by funds deposited into a Chase money-market savings
account.[77]   The letter from Chase also did not link the denial
specifically to the RNB-Target account.[78]   Chase listed Defendant
as the only consumer reporting agency on whose report Chase based
its denial.[79]

    Plaintiff also sought automobile insurance quotes from GEICO

---

[73]    Id. at Ex. 32, letter from Capital One to Plaintiff dated Jan. 14,
2004; Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004; Ex. 43, Bank
of America online application approval; Ex. 48, letter from Citibank to Plaintiff
dated Jan. 16, 2004; Ex. 52, letter from Discover to Plaintiff dated Jan. 15,
2004.

[74]    See id. at Ex. 32, letter from Capital One to Plaintiff dated Jan.
14, 2004; Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004; Ex. 48,
letter from Citibank to Plaintiff dated Jan. 16, 2004; Ex. 52, letter from
Discover to Plaintiff dated Jan. 15, 2004.

[75]    Id. at Ex. 32, letter from Capital One to Plaintiff dated Jan. 14,
2004.

[76]    See id.

[77]    Id. at Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004.

[78]    Id.

[79]    Id.

14

and Progressive, both of which provided quotes without adverse action letters.[80]   In February, Plaintiff applied for a United credit card, which was granted.[81]

Although the dispute between Plaintiff and Defendant was not resolved to Plaintiff's satisfaction, ultimately, RNB-Target instructed Defendant to remove the account from Plaintiff's credit report.[82]   Defendant made the change on January 19, 2004.[83]   After Defendant removed the RNB-Target account, Plaintiff decided to reapply for the credit cards that he had been denied him.[84] Plaintiff was ineligible to reapply for the Capital One credit card because fewer than forty-five days had passed since his prior application.[85]   Chase, however, allowed his application and issued

---

[80]     See id. at Ex. 40, GEICO quote; Ex. 41, Progressive quote.

[81]     See id. at Ex. 54, undated letter from United to Plaintiff.

[82]     See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 9, Declaration of Lynn Romanowski, ¶ 4.

[83]     Id.

[84]     See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, p. 237.   In his deposition, Plaintiff stated:
    I wanted to see after I knew that Target was taken off, if I could go back to those same people and get credit cards that had denied them, because I thought that would be really good evidence that the credit reporting agencies would [have] difficulty arguing with that it was the Target account that caused me the denial of credit, in fact, in reality.
Id.

[85]     See id. at pp. 237-38 (stating that he did not reapply after discovering that he was not eligible); Ex. 33, blank internet Capital One application.

him the credit card he sought.[86]

At about the same time, Defendant timely removed this action. Plaintiff did not contest the removal. A little over a year later, Defendant filed the pending motion for summary judgment. The court now addresses the issues raised by Defendant in that motion.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. Celotex Corp., 477 U.S. at 322. In response to a

---

[86] See Ex. 14, Plaintiff's Deposition, pp. 239-40; Ex. 36, undated letter from Chase to Plaintiff. The RNB-Target account was not the only account with derogatory information that had been deleted from his credit report. See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 9, Declaration of Lynn Romanowski, ¶¶ 6-7.

showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence which establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial. Id. at 324. A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. Id. at 250.

The nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." See Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  In the absence of summary judgment evidence that an actual controversy exists, the court cannot assume that the nonmoving party can or will prove the necessary facts at trial.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

### III.  Analysis

Plaintiff brought claims against Defendant under the FCRA for violations of its statutory reinvestigation obligations and under state law for libel.  The court addresses these separately.

### A.  FCRA Claims

Congress designed the FCRA to meet "the needs of commerce for consumer credit, personnel, insurance, and other information" while also ensuring "the confidentiality, accuracy, relevancy, and proper utilization" of consumer information.  15 U.S.C. § 1681(b); Stevenson v. TRW Inc., 987 F.2d 288, 292 (5th Cir. 1993).  The FCRA "defines a complex set of rights and obligations that attend the relationships among and between the provider of a credit report, the user of that information and the consumer who is made the subject of such a report." Sepulvado v. CSC Credit Servs., Inc., 158 F.3d 890, 895 (5th Cir. 1998).  The FCRA requires that consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual

about whom the report relates." 15 U.S.C. § 1681e(b); <u>see also</u> <u>Pinner v. Schmidt</u>, 805 F.2d 1258, 1261-62 (5th Cir. 1986). The statute also imposes on the consumer reporting agencies a duty to conduct a reasonable reinvestigation into any item that is disputed by a consumer. 15 U.S.C. § 1681i(a)(1)(A); <u>Pinner</u>, 805 F.2d at 1262.

With regard to this latter duty, the agency is allowed thirty days (unless extended in accordance with the statute) to conduct its reinvestigation. 15 U.S.C. § 1681i(a)(1). As part of the reinvestigation, the agency shall review and consider all relevant information in the consumer file and all relevant information submitted by the consumer regarding the dispute. 15 U.S.C. § 1681i(a)(4). Additionally, the agency must notify the creditor within five business days after receiving the consumer's notice of dispute. 15 U.S.C. § 1681i(a)(2)(A). "The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller." <u>Id.</u>

If an item is found to be inaccurate or incomplete, the agency promptly shall delete that item or modify it and shall notify the creditor that the item was deleted or modified. 15 U.S.C. § 1681i(a)(5)(A). Regardless of the outcome of the reinvestigation, the consumer reporting agency must provide written notice of the results to the consumer. 15 U.S.C. § 1681i(a)(6)(A). The consumer notice shall include, "if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of

19

the information . . ., including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available." 15 U.S.C. § 1681i(a)(6)(B)(iii). Finally, if the reinvestigation does not resolve the dispute, the consumer may file a statement explaining the nature of the dispute to be printed alongside the disputed item on the credit report. 15 U.S.C. § 1681i(b).

If a consumer reporting agency willfully fails to comply with these requirements, it may be liable for punitive damages in addition to actual damages. 15 U.S.C. § 1681n; Stevenson, 987 F.2d at 292; Pinner, 805 F.2d at 1262. However, the FCRA does not impose strict liability on consumer reporting agencies for negligent noncompliance. See 15 U.S.C. § 1681o; See Hyde v. Hibernia Nat'l Bank in Jefferson Parish, 861 F.2d 446, 447 (5th Cir. 1988); Thompson v. San Antonio Retail Merchs. Ass'n, 682 F.2d 509, 513 (5th Cir. 1982). A consumer reporting agency that unintentionally errs can be held liable only for the consumer's actual damages that resulted from the agency's failure to comply with the statute. See 15 U.S.C. § 1681o; Stevenson, 987 F.2d at 292; Pinner, 805 F.2d at 1262; Hyde, 861 F.2d at 448. To succeed on his FCRA claims, Plaintiff bears the ultimate burden of proving that a credit report issued by Defendant was a causal factor in the denial of credit. See Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001); Philbin v. Trans Union Corp., 101 F.3d

957, 969 (3$^d$ Cir. 1996); <u>Cahlin v. Gen. Motors Acceptance Corp.</u>, 936 F.2d 1151, 1161 (11th Cir. 1991).

In this lawsuit, Plaintiff alleged that Defendant failed to follow the reinvestigation provisions in that: 1) Defendant did not provide any information to RNB-Target within five days of receiving Plaintiff's dispute; 2) Defendant failed to provide RNB-Target with all of the relevant information regarding the dispute; and 3) Defendant failed to meet its duty to go beyond RNB-Target's response in verifying the accuracy of the reported information. Defendant moves for summary judgment on the basis that Plaintiff's file contained accurate information. Alternatively, Defendant counters Plaintiff's challenges to the reasonableness of its reinvestigation.[87]   Finally, Defendant argues that Plaintiff suffered no damages.   The court turns first to the accuracy question before reaching the other issues.

### 1.  Accuracy

The statute imposes a consumer reporting agency the duty to investigate any item disputed by a consumer, regardless of the

---

[87]    Defendant also addresses other complaints that Plaintiff raised during the course of their dispute, including Plaintiff's allegations that Defendant violated section 1681i by failing to provide Plaintiff with copies of the ACDVs when requested, falsely stating, in a letter to Plaintiff, that it contacted creditors by telephone, and failing to provide a telephone number for RNB-Target. <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 26, pp. 28-30.  Plaintiff does not pursue these allegations in his response to Defendant's summary judgment motion.  Despite the lack of response, the court has considered the viability of these claims and finds that they all fail for lack of evidence that they caused Plaintiff any damage.  Moreover, the first two complaints do not allege any action in violation of the statute and the third complaint is not supported by the facts.

ultimate determination on accuracy.[88]   <u>See</u> 15 U.S.C. §
1681i(a)(1)(A).   At the same time, case law and common sense
dictate that a consumer may bring a claim under the FCRA for
negligent noncompliance only when an inaccuracy has been included
on his credit report.   <u>Cf.</u> <u>Cahlin</u>, 936 F.2d at 1160 ("[A] section
[1681i(a)] claim is properly raised when a particular credit report
contains a *factual* deficiency or error that could have been
remedied by uncovering additional facts that provide a more
accurate representation about a particular entry.").   Absent an
inaccuracy in a credit report that was published to a third party,
no damages proximately caused by an FCRA violation would result.
<u>See</u> <u>Hyde</u>, 861 F.2d at 448.

Plaintiff contends that the information on the RNB-Target
account was inaccurate in that it stated that he was jointly
responsible for the debt.   Defendant argues that it was entitled,
even obligated, under the ECOA to label the account as joint

---

[88]   Defendant argues that evidence of the inaccuracy of the reported
information is required to establish a section 1681i prima facie case.   Case law
is not so clear that the accuracy of the information would absolve a consumer
reporting agency from its reinvestigation requirements.   No Fifth Circuit opinion
specifically identifies the prima facie elements of a section 1681i claim.
However, two opinions out of the northern district of Texas omit accuracy from
the list of elements, stating that a section 1681i(a) claim requires proof that:
1) the consumer "disputed the completeness or accuracy of an item of information
contained in her consumer file;" 2) the consumer reporting agency "did not
reinvestigate free of charge and either record the current status of the disputed
information or delete the item from the file . . . within the statutory period;"
3) the consumer reporting agency's noncompliance was negligent; 4) the consumer
suffered an injury; and 5) the injury was caused by the consumer reporting
agency's "failure to reinvestigate and record the current status of the disputed
information or delete the item from the file." <u>Waggoner v. Trans Union, LLC</u>, No.
Civ. A. 302CV1494G, 2003 WL 22220668, at *9 (N.D. Tex. July 17, 2003); <u>Zala v.
Trans Union, LLC</u>, No. CIV. A. 3:99-CV-0399, 2001 WL 210693, at *5 (N.D. Tex. Jan.
17, 2001).

because RNB-Target reported the account with a joint responsibility ECOA designation.  Because the reporting of the account as joint was authorized by federal law, Defendant insists, it was accurate. Defendant's argument is unconvincing.  Despite Defendant's profuse citation to the ECOA, it cites no provision that establishes that Plaintiff was jointly responsible for the account.

The ECOA protects consumers against credit discrimination based on race, color, religion, national origin, sex, marital status, age, or status as recipients of public assistance.  15 U.S.C. § 1691(a).  The statute is designed to allow equal access to credit for all creditworthy customers and to set rules concerning what information can and cannot be considered by creditors.  See id.

Defendant attempts to convert the provisions of the ECOA into something they are not.  For example, relying on the ECOA's implementing regulations, Defendant argues that Plaintiff's signature was not required on the application in order for RNB-Target to designate the account as a joint account.  However, the regulations upon which Defendant relies say no such thing.  The regulations only explain when a spouse's signature may be required on a credit instrument for qualification purposes.  See 12 C.F.R. § 202.7(d)(3).  They say nothing about whether a spouse is obligated on an account without a signature.  See id. Supplement I to part 202 of section 12 of the Code of Federal Regulations explains section 202.7(d)(3) with regard to joint applications:

23

The term "joint applicant" refers to someone who applies contemporaneously with the applicant for shared or joint credit.  It does not refer to someone whose signature is required by the creditor as a condition for granting the credit requested.

. . . A person's intent to be a joint applicant must be evidenced at the time of application. . . . [S]ignatures or initials on a credit application affirming applicants' intent to apply for joint credit may be used to establish intent to apply for joint credit.

The regulations require a creditor to designate accounts "to reflect the participation of both spouses *if* the applicant's spouse is permitted to use or is contractually liable on the account."  12 C.F.R. § 202.10 (emphasis added).  This section does not authorize creditors to designate accounts held individually by one spouse as joint accounts; nor does it place an imprimatur of accuracy on designations made by creditors.  The ECOA simply does not authorize a creditor to report a person as a joint account-holder without some indication that person intended to be jointly responsible for that debt.

Defendant failed to produce any evidence of Plaintiff's intent to be a joint applicant at the time of application.  The application itself does not contain Plaintiff's signature or indicate in any other way that he intended to apply for a joint account with Rebecca.  Plaintiff's only contemporaneous connection to the account was by virtue of his status as Rebecca's husband. Defendant cites the court to no legal authority holding that a husband is jointly liable on all credit card accounts established

by his wife.  The ECOA regulations specifically allow creditworthy persons to open individual accounts regardless of marital status and acknowledge the difference between individual and joint accounts.  See 12 C.F.R. § 202.7(a) and (d)(1).  Short on legal or evidentiary support, Defendant fails to establish the accuracy of the joint responsibility status as a matter of law and the question remains whether the information in the credit report was accurate. Thus, the court must consider each of the alleged violations of the statute.

### 2.  Five-day Notice Requirement

As to Plaintiff's allegation that Defendant failed to provide timely notice to RNB-Target of the dispute, Defendant does not contest the evidence establishing that it did not notify RNB-Target within the five-day statutory period.  Rather, Defendant argues that it did not owe a duty to Plaintiff, as a consumer, to transmit the dispute within the statutory time period and that Plaintiff suffered no harm as a result of the delay.  The court disagrees with Defendant on the first point, but agrees on the second.

Although interesting and mildly appealing, Defendant's argument that the five-day notice requirement is a duty owed the creditor, not Plaintiff, reads too much into the statute.  Section 1681i imposes requirements without specifying to whom each duty is owed.  See 15 U.S.C. § 1681i(a)(2)(A).  Consumer reporting agencies are liable for damages suffered by a consumer as a result of the

25

agency's failure to comply with *any* requirement.  See 15 U.S.C. §§ 1681n, 1681o.  As suggested by the damages provisions, every duty in the statute ultimately is owed to the consumer.

On the other hand, a consumer is entitled only to those damages caused by the particular act of noncompliance.  In this case, Plaintiff suffered no harm from Defendant's failure to comply with the five-day notice requirement.  Despite its initial delay, Defendant managed to comply with section 1681i(a)(1)(A) by recording the status of the account after reinvestigation before thirty days elapsed after Defendant received Plaintiff's notice of dispute.[89]  Moreover, the uncontroverted evidence indicates that a more prompt notice to RNB-Target would not have changed its response.[90]

The statute seems to indicate that, even absent evidence that Defendant's noncompliance caused actual damages, Defendant could be liable for punitive damages upon a showing of willfulness.  See 15 U.S.C. § 1681n(a)(2)(separating the entitlement to punitive damages from the causation requirement).  However, in order to support a finding of willfulness to justify punitive damages, Plaintiff must produce evidence that Defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others."

---

[89]    See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, pp. 49-50; Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003; Ex. 17, consumer report dated Aug. 12, 2003.

[90]    See id. at Ex. 12, Deposition of Susan Wolf, p. 251.

Cousin v. Trans Union Corp., 246 F.3d 359, 372 (5th Cir. 2001)
(quoting Pinner, 805 F.2d at 1263); see also Stevenson, 987 F.2d at
293.  Two Fifth Circuit opinions held that damages for willfulness
are appropriate only on evidence that the defendant engaged in
"willful misrepresentations or concealments." Cousin, 246 F.3d at
374; Stevenson, 987 F.2d at 294.

No summary judgment evidence supports the conclusion that
Defendant knowingly and intentionally delayed notifying RNB-Target
of Plaintiff's dispute in conscious disregard for Plaintiff's
rights or that Defendant set out to harm Plaintiff.[91]  The summary
judgment record includes no evidence of misrepresentation or
concealment.   Cf. Cousin, 246 F.3d at 372, 374 (finding
insufficient evidence of willfulness); Pinner, 805 F.2d at 1263
(same); Stevenson, 987 F.2d at 294 (same).  Defendant's actions do
not rise to the level of willfulness.

### 3.  All Relevant Information Requirement

In response to Plaintiff's allegation that Defendant failed to
provide RNB-Target with "all relevant information regarding the
dispute that the agency has received from the consumer," Defendant
argues that it complied with section 1681i(a)(2) by providing RNB-
Target with enough information to allow it to conduct its
reinvestigation.  Defendant contends that its ACDV procedure is an

---

[91]     Plaintiff argues that Defendant adopted its reinvestigation policy
with reckless disregard to the rights of consumers, but produces no supporting
evidence.

adequate means of transmitting information and that it did not need to include a copy of Plaintiff's letter of dispute or any other additional information.  The court agrees.

After receiving Plaintiff's letter of dispute, Defendant generated an ACDV, which indicated that Plaintiff disputed his liability for the account, specifically on the basis that the account was never joint.[92]  The use of an ACDV form is an accepted method of communicating the details of a consumer dispute.  See Davis v. Equifax Info. Servs., LLC, 346 F. Supp.2d 1164, 1176 (N.D. Ala. 2004); Quinn v. Experian Solutions, No. 02 C 5908, 2004 WL 609357, at *6 (N.D. Ill. Mar. 24, 2004).  Nothing in the FCRA requires Defendant to append a copy of the consumer's dispute letter.  Here, Defendant's ACDV form reveals the nature of Plaintiff's challenge and alerts RNB-Target to the need for review of the documentation establishing the account to determine whether Plaintiff ever was a joint obligor.

No summary judgment evidence indicates that RNB-Target needed any other information to complete a reinvestigation.  To the contrary, the evidence shows that the information provided was sufficient.[93]  Moreover, because Plaintiff provided RNB-Target with all the details of his dispute by separate letter dated the same

---

[92]    Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 57, RNB-Target Aug. 9, 2003, response to ACDV form dated July 30, 2003.

[93]    Id. at Ex. 12, Deposition of Susan Wolf, p. 250.

day of his letter to Defendant, RNB-Target knew the details of Plaintiff's dispute.[94]  Therefore, even if Defendant had provided additional information, RNB-Target's response would not have changed.[95]  Based on these facts, no reasonable jury could find for Plaintiff.

Finding no violation of the all relevant information requirement, the court need not discuss whether Plaintiff suffered any harm caused by the violation or whether the violation could be characterized as willful.

### 4.  Heightened Duty

Defendant disagrees with Plaintiff that it owed a heightened duty to investigate Plaintiff's dispute beyond contacting RNB-Target and accepting the creditor's response.  Defendant argues that the requirement to go beyond the original source of information finds its roots in out-of-circuit law based on an earlier version of the FCRA.  Even if it is applicable here, Defendant argues, its reinvestigation was reasonable as a matter of law.  Although recognizing that the Fifth Circuit has imposed a heightened duty under certain circumstances, the court agrees that, under the present facts, Defendant's reinvestigation passes the reasonableness test.

The FCRA imposes no specific duty on a consumer reporting

---

[94]    Id. at Ex. 14, Plaintiff's Deposition, p. 50; Ex. 58, letter from Plaintiff to RNB dated July 16, 2003.

[95]    See id. at Ex. 12, Deposition of Susan Wolf, pp. 252-53, 310

agency to conduct its own reinvestigation apart from contacting the furnisher of the disputed information.  See 15 U.S.C. § 1681i. However, it does require that the reinvestigation be reasonable. See 15 U.S.C. § 1681i(a)(1)(A).  The Fifth Circuit, along with other circuits, has recognized that a reasonable investigation may require a consumer reporting agency to go to greater depths in verifying accuracy than simply relying on the response by the original source of information.  See Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997)(holding that a consumer reporting agency may be required, in some cases, to verify the accuracy of its initial source of information); Henson v. CSC Credit Servs., 29 F.3d 280, 287 (7th Cir. 1994)(holding that a reporting agency may be required to verify the accuracy by way of a more thorough investigation); Stevenson, 987 F.2d at 293 (holding that, given the complexity of the consumer dispute, the consumer reporting agency acted unreasonably in relying solely on CDV forms); Pinner, 805 F.2d at 1262 (holding that an agency's investigation was unreasonable where the only person contacted for verification was an individual who was known to have a poor relationship with the consumer).  "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." Stevenson, 987 F.2d at 293.

According to Seventh Circuit law, the duty to go beyond the original source arises when:  1) "the consumer has alerted the

reporting agency to the possibility that the source may be unreliable" or the agency has reason to question the source's reliability; and 2) "the cost of verifying the accuracy of the source [does not outweigh] the possible harm inaccurately reported information may cause the consumer." Henson, 29 F.3d at 287; see also Pinner, 805 F.2d at 1262 (favorably citing a case in which the Sixth Circuit held that merely making two phone calls to creditors was unreasonable when the agency was aware of disputes between the creditors and the consumer). Many district courts recently have employed the Henson factors when measuring reasonableness. E.g., McKeown v. Sears Roebuck & Co., 335 F. Supp.2d 917, 935 (W.D. Wis. 2004); Neal v. CSC Credit Servs., Inc., No. 8:02CV378, 2004 WL 628214 (D. Neb. Mar. 30, 2004), at *5; Quinn, 2004 WL 609357, at *6. Weighing these factors to assess the reasonableness of the agency's investigation is left to the jury. Henson, 29 F.3d at 287; Cushman, 115 F.3d at 225-26.

In this case, Plaintiff failed to present evidence from which a reasonable jury could find that Defendant was alerted to the possibility that RNB-Target was unreliable. Defendant produced evidence of a long-standing contractual relationship with RNB-Target pursuant to which Target certified the accuracy of the information it provided Defendant.[96] The testimony demonstrates that no report of unreliability had been made to Defendant

---

[96]    See Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12.

regarding information from RNB-Target over the course of at least eleven years and that Defendant had no reason to question RNB-Target's reliability.[97]   Despite Plaintiff's own accusations of Target's "deaf[ness] to reality,"[98] "bureaucratic bungling,"[99] and "feckless attitude,"[100] Plaintiff failed to produce evidence that Defendant knew RNB-Target was an unreliable source of information. Regardless of the intensity of Plaintiff's complaints about RNB-Target or the volume and degree of his displeasure, Plaintiff's disagreement with RNB-Target, on its own, is insufficient to raise an issue of reliability, especially in light of Defendant's long history with Target without complaint.   See Anderson v. Trans Union LLC, 367 F. Supp.2d 1225, 1233 (W.D. Wis. 2005)(stating that the only evidence of unreliability was the mistakes in that particular case, which could not be relied upon as evidence that the creditor was unreliable).   Even assuming the Henson factors are recognized by the Fifth Circuit as a method for determining the reasonableness of a consumer reporting agency's reinvestigation, Plaintiff cannot survive summary judgment without some evidence of unreliability.

Overall, no reasonable jury could find Defendant's investigation was unreasonable.   As detailed above, Defendant

---

[97]     See id. at ¶ 13.

[98]     See id. at Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003, p. 3.

[99]     See id.

[100]     See id.

responded to Plaintiff's dispute by reviewing his letter, notifying RNB-Target by ACDV, updating the date reported according to RNB-Target's instructions, mailing the results to Plaintiff, and completing the process within the statutory time period.  Defendant generally followed the procedures outlined in section 1681i, responded to all of Plaintiff's correspondence and telephone calls, completed a second reinvestigation on its own initiative, provided Plaintiff with the name, address, and telephone number for Target, and added Plaintiff's statement of dispute to his report. Therefore, Defendant could not be said to have ignored the FCRA reinvestigation requirements.

**B.  Libel Claim**

Under Texas state law, "[a] libel is a defamation expressed in written or other graphic form that . . . tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation."  Tex. Civ. Prac. & Rem. Code 73.001.  The FCRA provides consumer credit agencies with qualified immunity from defamation claims unless they reported false information "with malice or willful intent to injure such consumer."  15 U.S.C. § 1681h(e); see also Cousin, 246 F.3d at 375.  Defamation with malice requires proof that the defendant either knew the published words were false when published or published them with reckless disregard for their truth.  Cousin,

246 F.3d at 375.

Defendant argues that the information was accurate, barring any claim for defamation, and that, even if the information was inaccurate, Defendant was entitled to statutory qualified immunity. Plaintiff insists that he was not responsible for the debt as was reflected in the credit report and that Defendant published the information with knowledge that it was false or in reckless disregard for whether it was false.

As discussed above, the court finds no evidence of malice or willful intent to injure Plaintiff.   Therefore, Plaintiff cannot maintain a defamation claim.   See Cousin, 246 F.3d at 376 n.24 (noting, without expressing the Fifth Circuit's view, that the Eighth Circuit recognizes a higher standard of proof of willfulness to overcome qualified immunity than required to justify punitive damages).   Plaintiff points the court to absolutely no evidence that would support such a finding.   Thus, Plaintiff's libel claim should be dismissed.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED**.   Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment is **DENIED**.   Defendant's motion to strike Plaintiff's response evidence is **DENIED** and Plaintiff's objections to Defendant's evidence are **OVERRULED**.   If this Memorandum and Recommendation is adopted, all remaining

motions should be **DENIED AS MOOT.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, either electronically or by mail to P.O. Box 61010, Houston, Texas, 77208. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

SIGNED in Houston, Texas, this 20th day of July, 2005.

Nancy K. Johnson
United States Magistrate Judge